**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           v.<br><br>CARLOS ESPINOLA,JOSEPH BALDASSANO,<br>MATTHEW CREAM and JASON MATTHEWS,<br>               Defendants, | **CRIMINAL ACTION**<br>**NO. 04-1809-CBS** |

**MEMORANDUM OF PROBABLE CAUSE AND**
**ORDER OF DETENTION**
**July 16, 2004**

**SWARTWOOD, M.J.**

I.  Nature of the Offense and the Government's Motion

On June 29, 2004, a Criminal Complaint was filed, charging multiple individuals, including Carlos Espinola ("Mr. Espinola"), Joseph Baldassano ("Mr. Baldassano"), Matthew Cream ("Mr. Cream") and Jason Matthews ("Mr. Matthews")(collectively "Defendants"), with conspiracy to distribute oxycodone, a Schedule II controlled substance, and knowingly and intentionally distributing oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. §§846 and 841(a)(1).

At these Defendants' initial appearance on June 30, 2004, they were advised of their right to a preliminary examination in accordance with Fed. R. Crim. P. 5.1 and the Government moved for

a detention hearing in accordance with 18 U.S.C. §§3142(f)(1)(C)(Defendants are charged with an offense for which a maximum term of imprisonment of ten years or more is prescribed in the "Controlled Substances Act"), and (f)(2)(A)(risk of flight).

A consolidated probable cause/detention hearing was held on July 12, 2004 and at this hearing, Steven Story, Special Agent with the Drug Enforcement Administration, testified on behalf of the Government and was cross-examined by Defendants' counsel. At the conclusion of the evidence, (i) the detention portion of Mr. Espinola's hearing was continued until July 13, 2004 to permit him to be interviewed by Pre-Trial Services, and (ii) I released Mr. Matthews on conditions.

## II.  Findings of Fact

1.  Special Agent Story is the case agent in connection with an investigation concerning the distribution of oxycodone in the North Shore area of Massachusetts.  This investigation commenced in October 2003 and concluded on June 30, 2004 with the arrest of more than thirteen Defendants.  During this investigation, Special Agent Story and other law enforcement officials involved in this investigation used confidential informants, undercover agents, surveillance of individuals and locations, pen register/trap and trace devices and recorded and monitored controlled purchases of oxycodone.

2.  Over a several month period from October 29, 2003 to June 10, 2004, five undercover law enforcement agents ("UCs")

established themselves as purchasers (and possible suppliers) of substantial amounts of oxycodone in the Gloucester, Massachusetts area. During this period, in sixteen separate transactions, the UCs purchased more than eleven hundred 80 mg OxyContin tablets[1]. Gov't Ex. 1.

3.    On November 25, 2003, UC1 placed a consensually recorded telephone conversation to Keith Behsman ("Mr. Behsman"), a Co-Defendant in this case, who confirmed a deal for the purchase of 100 OxyContin tablets for $5500 and instructed UC1 and UC2 to meet him at the Bugaboo Creek parking lot on Route 114 in Peabody. When the UCs and Mr. Behsman met, Mr. Behsman called his supplier and then told the UCs that the deal would take place in a bathroom at the North Shore Mall in Peabody. Mr. Behsman told the UCs that he would meet his supplier in the Eastern Mountain Sports ("EMS") store at the Mall and that the window in this store overlooked the bathroom where the transaction would take place. Id.

4.    After the UCs and Mr. Behsman entered EMS, they observed three males enter the store, two of whom were later identified by surveillance agents as Mr. Baldassano and Jonathan Mitchell, a Co-Defendant. Once Mr. Behsman indicated to UC2 that the deal was imminent, UC2 handed Mr. Behsman $5500. Mr. Behsman then exited EMS and went to a corridor leading to a bathroom, which was visible from the EMS store. Messrs. Baldassano and Mitchell then left EMS,

---

[1]OxyContin is a brand name for oxycodone.

while the third male waited with the UCs.  Mr. Baldassano was then observed conducting a hand to hand transaction with Mr. Behsman during which Mr. Baldassano gave a box to Mr. Behsman in return for currency.  Mr. Behsman then nodded to the UCs.  Messrs. Baldassano and Mitchell and the third, unidentified male, left the area together.  Thereafter, the UCs and Mr. Behsman returned to Mr. Behsman's mall parking lot where the UCs where given the box containing the pills and Mr. Behsman was given $200 for brokering the deal.  It was later determined that there were 98 80 mg OxyContin pills in the box.  The pills were sent to a laboratory for analysis and tested positive for oxycodone. Id.

5.   On December 1, 2003, Mr. Behsman indicated to the UCs that his regular supplier was ready to supply them with as many OxyContin pills as they wanted to buy and that his supplier had set aside 100 pills for them to purchase.  Mr. Behsman and the UCs agreed that the deal would take place on December 2.  Mr. Behsman indicated that the deal would take place at Bugaboo Creek and that his supplier would be present.  On December 2, 2003, Messrs. Behsman and Baldassano and a third male, later identified as Co-Defendant Jared Knowlton, met the UCs at the Bugaboo Creek restaurant.  It was agreed that Mr. Behsman and UC1 would go out to the UCs' car in the parking lot and count the pills while Messrs. Baldassano and Knowlton remained in the restaurant with UC2.  In the parking lot, Mr. Behsman gave 100 pills to UC1.  Meanwhile, UC2 and Messrs. Baldassano and Knowlton discussed the fact that UC2 had

4

been shorted 2 pills in the November 23 transaction. Mr. Baldassano told UC2 that he is never short and Mr. Knowlton added that they had counted the pills three times this time. During this conversation, Mr. Baldassano also told UC2 that: his source sells thousands of OxyContin pills at a time and receives ten thousand pills a week; and that he could supply the UCs with 100-200 pills per week without interruption. Thereafter, UC1 and Mr. Behsman returned to the table and UC1 confirmed that there were 100 pills. UC2 then handed $5500 to Mr. Knowlton who placed it in his pocket and shortly thereafter, Messrs. Baldassano and Knowlton exited the restaurant. Surveillance agents then followed the vehicle occupied by Messrs. Knowlton and Baldassano. After a brief stop, Messrs. Knowlton and Baldassano went to a residence on Endicott Street in Peabody where Mr. Espinola has an apartment on the third floor. The 100 pills received by the UCs in this transaction tested positive for oxycodone. Id.

6. On January 6, 2004, Mr. Behsman sold the UCs 100 OxyContin pills for $5,500. During discussions prior to and during this transaction, Mr. Behsman indicated that he would be obtaining the pills from his usual dealer, Mr. Baldassano, that Mr. Baldassano did not like to handle the pills directly on his person and instead, has other people deal for him, and that Mr. Baldassano has regular access to substantial quantities of OxyContin at all times. Id.

7.    On January 13, 2004, the UCs asked Mr. Behsman to call Mr. Baldassano to negotiate a deal whereby Mr. Baldassano would be able to purchase 80 mg OxyContin tablets from the UCs for $35 per pill.  The UCs also agreed to purchase 100 OxyContin tablets the next day.  On January 14, 2004, the UCs spoke to Mr. Behsman who indicated "Baldy" was ready to complete the deal through one of his friends "Creamy".  After some further discussion, Messrs. Behsman and Baldassano came to the UCs' apartment to discuss the deal whereby the UCs would sell Mr. Baldassano 80 mg OxyContin tablets for $35 each.  Mr. Baldassano indicated that he was not interested because he would not stop dealing with his current supplier, whom he had been dealing with for over four years.  Mr. Baldassano told the UCs that his supplier had been unable to obtain OxyContin only once during that period and that he had recently received 35,000 pills.  Messrs. Behsman and Baldassano then left the UCs' apartment and as they did, Mr. Behsman indicated that he and Creamy would be back with the 100 OxyContin pills.  Thereafter, Mr. Behsman and "Creamy" returned to the UCs' apartment.  Surveillance agents identified "Creamy" as Mr. Cream.  Mr. Cream placed a clear plastic bag containing the pills on the table and was handed $5500 by UC2.  After UC1 started counting the pills, Mr. Cream informed him there were only 99 and agreed to a $60 reimbursement.  Messrs. Behsman and Cream then left the apartment.  The 99 pills purchased during this transaction were sent to the laboratory and tested positive for oxycodone. Id.

8.   On January 22, 2004, UC3 arranged to purchase 13 OxyContin tablets from Co-Defendant Giuseppe "Joe" Torrente, who indicated that he was out at the time because his usual source had been arrested and he was having to obtain OxyContin from a different source.   Later that day, Mr. Torrente met UC3 and UC4 near a Dunkin Donuts in Gloucester.   Mr. Torrente indicated that they would have to drive to meet his source.   Mr. Torrente and the UCs drove in the UCs' vehicle and during the trip, Mr. Torrente made a call on his cellular telephone.   During this call, UC3 observed the name "Creamy" on Mr. Torrente's cell phone.   When Mr. Torrente hung up, he said his source would be arriving any moment and that he would ride around the block with the source and return with the OxyContin.   Shortly thereafter, a car driven by Mr. Cream arrived (Mr. Cream was the sole occupant).   UC3 handed Mr. Torrente $1000, the agreed price for the 13 pills, and Mr. Torrente got into Mr. Cream's vehicle and they drove away.   Thereafter, Mr. Torrente returned with Mr. Cream.   After Mr. Torrente exited Mr. Cream's vehicle, Mr. Cream drove away.   Mr. Torrente gave the UCs 13 pills which were sent to the laboratory and tested positive for oxycodone. Id.

9.   On February 5, 2004, Special Agent Story interviewed Mr. Mathews who had been arrested by local law enforcement officials who had advised him of his *Miranda* rights.   Mr. Mathews told Special Agent Storey that he had been selling OxyContin in

Gloucester for two years and his source was a member of the Red Devils Motorcycle Club named "Karlos". Mr. Matthews estimated that he purchased OxyContin from Karlos on 50 occasions. Mr. Matthews also stated that his partner in his OxyContin distribution activities was "Joe Cream" with whom he regularly split packages of 500 80 mg OxyContin tablets which they obtained from Karlos and distributed in Gloucester. Mr. Matthews had personally obtained up to 300 80 mg OxyContin pills from Karlos and had seen Karlos in possession of a plastic bag containing 1000 80 mg OxyContin pills. Mr. Matthews also told Special Agent Story that Karlos sold steroids. Id.

10.    Mr. Mathews gave Agent Story the following identifying information concerning "Karlos": Karlos is 27-28 years old, tall and thin with short brown hair, wears glasses, has tattoos of flames on his forearms and is of Portugese descent; Karlos lives on Endicott Street in Peabody (Mr. Mathews gave an exact description and location of Mr. Espinola's house on Endicott Street in Peabody, *i.e.*, he indicated that Karlos lived in the third floor apartment, his parents lived on the second floor and the first floor was rented out to tenants); Karlos drives a black "Cadillac STS" (records from the Registry of Motor Vehicles indicate that a black 1997 Cadillac Cater is registered to Carlos Espinola of 63 Endicott Street in Peabody); that "Karlos" had a Nextel phone assigned the number "978-479-5801" (a check of Nextel records indicated that Mr.

8

Espinola had two Nextel phones, one with the number "978-479-6192" and one with the number "978-360-5801"); that Karlos had purchased a bullet proof vest from someone in Beverly, Massachusetts (a bullet proof vest was found in Mr. Espinola's apartment after he consented to a search of his apartment upon his arrest); and that Karlos had a girlfriend named Michelle (Mr. Espinola has a girlfriend named Michelle). Id.

11.  On March 16, 2004, the UCs determined that Mr. Baldassano had received a call from Mr. Espinola on his cell phone. Thereafter, UC2 called Mr. Baldassano and asked to purchase 300 OxyContin pills.  Sometime thereafter, Mr. Baldassano called UC2 and said he would contact his source about the 300 pills and call him back that evening.  Records show that Mr. Baldassano then called Mr. Espinola's cell phone.  Thirty-five minutes later, Mr. Baldassano called UC2 and indicated that no deal could be done until he spoke to his source.  No deal was completed on March 16, 2004.  Late in the afternoon on March 17, 2004, the UCs spoke with Mr. Baldassano who indicated that his source had agreed to do the deal.  However, the deal eventually fell through because the UCs, Mr. Baldassano and his source could not agree on a location to conduct the transaction.  Id.

12.  On April 6, 2004, UC2 had a phone conversation with Mr. Behsman during which Mr. Behsman indicated that Mr. Baldassano had now moved to Lowell to attend college, that Mr. Baldassano had recently sold 400 OxyContin pills to Philip Albert, Jr., a Co-

9

Defendant, that Mr. Baldassano had started selling OxyContin to minors and that Mr. Baldassano's source was Carlos from Peabody who often carried a firearm. Id.

13.  On June 7, 2004, UC5 made arrangements to purchase 100 OxyContin tablets from Mr. Baldassano.  Mr. Baldassano agreed to meet the UC as Steve's Restaurant ("Steve's") in Gloucester.  Prior to the UC arriving at the restaurant, Mr. Baldassano attempted to cancel the transaction because he had observed numerous police in the area.  Mr. Baldassano left the restaurant and walked toward Washington Street.  While walking on Washington Street, Mr. Baldassano called the UC and told him to pick him up on a side street.  After the UC turned onto the side street indicated by Mr. Baldassano and met up with him, Mr. Baldassano entered the rear passenger seat of the UC's vehicle.  Mr. Baldassano told the UC not to go near the restaurant and that they had to pick up Joey Allen and then they could go to the "dude's house" in Peabody (and, presumably, get the pills).  Ultimately, Mr. Baldassano had the UC proceed towards Peabody without picking up Mr. Allen.  Mr. Baldassano directed the UC towards a residence at 20 Tracey Street in Peabody, Massachusetts ("20 Tracey Street"), where Jose Melo, a Co-Defendant, resides.  As the vehicle approached 20 Tracey Street, Mr. Baldassano told the UC that "this dude runs for my dude".  After arriving at 20 Tracey Street, Mr. Baldassano went into the residence, returned to the UC's vehicle, got back inside and handed the UC a bag containing what appeared to be 100 80 mg OxyContin

tablets in return for $5,200.  Mr. Baldassano then returned to 20 Tracy Street and was observed with Mr. Melo.  Thereafter, a Jeep Cherokee with Messrs. Mathews, Allen and Cream inside pulled up in front of 20 Tracey Street and picked up Mr. Baldassano.

14.  On June 10, 2004, UC5 contacted Mr. Baldassano and indicated that he was ready to purchase 500 OxyContin tablets.  Mr. Baldassano indicated that he would call his source and confirm the deal.  Thereafter, it was agreed to meet that day to complete the deal. That afternoon, UC5 picked Mr. Baldassano up in Lowell. Eventually, it was determined that the deal would take place at the 99 Restaurant in Danvers.  While the deal was being arranged, UC5 asked Mr. Baldassano whether his source was "cool" and Mr. Baldassano responded that he had been obtaining OxyContin from this source for five or six years.  After UC5 and Mr. Baldassano arrived at the 99 Restaurant in Danvers, Mr. Melo was observed leaving 20 Tracey Street and traveling to that same restaurant.  After talking to Mr. Baldassano on his cell phone, Mr. Melo entered the 99 Restaurant and was introduced to UC5.  UC5 and Messrs. Melo and Baldassano then agreed that the deal would be conducted in the parking lot and discussed how it would be completed.  Once in the parking lot, Mr. Melo got into his vehicle and was joined by Mr. Baldassano.  Mr. Melo handed a plastic bag to Mr. Baldassano, who then got out of the vehicle, got into the UC5's vehicle and displayed the bag containing the OxyContin tablets to UC5.  UC5 then contacted UC6 (who was described to Mr. Baldassano as UC5's

11

girlfriend) who arrived with $24,000 in cash which was given to Mr. Baldassano in exchange for the plastic bag containing what appeared to be 500 80 mg OxyContin tablets. Eventually, Mr. Baldassano got out of UC5's vehicle and got back into Mr. Melo's vehicle and they drove away. Mr. Melo then dropped Mr. Baldassano off at a mall, where he was later picked up by Messrs. Cream and Allen.

15. The 600 tablets purchased by UC5 in these last two transactions have been sent to a laboratory for analyses. In both transactions, the tablets purchased by UC5 were consistent with OxyContin tablets in that they were greenish-blue, round-shaped tablets with an "80" on one side and "OC" on the other side.

16. At the time of his arrest, Mr. Baldassano possessed $8,000. After being arrested and being advised of his Miranda rights, Mr. Baldassano told law enforcement officials that his source for OxyContin was Mr. Espinola and that at the time of his arrest, he was awaiting a call concerning the purchase of 500 OxyContin pills.

### III. <u>Probable Cause</u>

I find probable cause for the offense charged in this Complaint against Messrs. Espinola, Baldassano, Cream and Matthews. The Government has presented overwhelming evidence that Mr. Baldassano was a large distributor of OxyContin in the Gloucester area, including multiple sales of OxyContin tablets to UCs which were recorded and/or videotaped. Mr. Matthews has admitted his role as a distributor of OxyContin in the Gloucester area. The

Government has presented substantial evidence that Mr. Cream was at least a runner who delivered OxyContin pills and picked up money for Mr. Baldassano. There is also evidence, albeit less strong, that Mr. Cream himself distributed OxyContin.

The evidence against Mr. Espinola, while circumstantial, is substantial. Multiple individuals involved in this conspiracy have identified Carlos from Peabody as an endless source of OxyContin in the Gloucester area over a long period of time. While it is true that there are some minor discrepancies between Mr. Matthews' description of "Karlos" and Mr. Espinola[2], it is beyond doubt that the "Karlos" referred to by Mr. Matthews is Mr. Espinola. Furthermore, Mr. Baldassano and others have indicated that Mr. Espinola was their source of OxyContin. Under these circumstances, the Government has met its burden of establishing that there exists probable cause to believe that Mr. Espinola committed the offenses with which he has been charged in this Complaint.

## IV.  The Bail Reform Act

### A.  Discussion of the Bail Reform Act

Under 18 U.S.C. § 3142 ("The Bail Reform Act" or "the Act"), the judicial officer shall order that, pending trial, the Defendant be (1) released on his own recognizance or upon execution of an unsecured bond; (2) released on a condition or combination of

---

[2] Counsel for Mr. Espinola made much of the fact that Mr. Matthews described "Karlos" as tall. While I agree with counsel that compared to Special Agent Story, who he estimated to be 6'5", Mr. Espinola certainly would not be considered tall, it was Mr. Matthews who was describing "Karlos" and Mr. Matthews is much slighter of stature than is Special Agent Story.

conditions; (3) temporarily detained to permit revocation of conditional release, deportation, or exclusion; or (4) detained. 18 U.S.C. § 3142(a). Under the Act, the judicial officer may detain a person pending trial only if, after a detention hearing held pursuant to 18 U.S.C. § 3142(f), the judicial officer determines that "no condition or combination of conditions [set forth under 18 U.S.C. § 3142 (b) or (c)] will reasonably assure the appearance of the person as required and the safety of any other person and the community". 18 U.S.C. § 3142(e). The Supreme Court, in <u>United States v. Salerno</u>, 481 U.S. 739, 747, 107 S.Ct. 2095(1987) has cautioned that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." <u>Id.</u> at 755, 107 S.Ct. at 2105. For this reason, the Defendant may be detained only if the judicial officer finds by (1) clear and convincing evidence, that the Defendant is a danger to the community, or (2) a preponderance of the evidence, that the Defendant poses a risk of flight. <u>See</u> 18 U.S.C. § 3142 (f); <u>United States v. Jackson</u>, 823 F.2d 4-5 (2d Cir. 1987); <u>United States v. Berrios-Berrios</u>, 791 F.2d 246, 250 (2d Cir. (1986), cert. denied, 479 U.S. 978, 107 S.Ct. 562 (1986). <u>See also United States v. Patriarca</u>, 948 F.2d 789, 792-93 (1st Cir. 1991). Furthermore, the judicial officer "may not impose financial condition that results in the pretrial detention of the person". 18 U.S.C. § 3142 (c).

The Bail Reform Act establishes a two step procedure for making the determination that the Defendant should be detained. First, the Government is entitled to move for detention where the Defendant has been charged with one of the offenses enumerated in the statute for which Congress has determined that detention is warranted.  See 18 U.S.C. § 3142 (f)(1).  The Government may also move for detention, or the judicial officer may on his or her own motion move for detention, where the case involves a serious risk that the Defendant will flee or that the Defendant will obstruct or attempt to obstruct justice.  18 U.S.C. § 3142(f)(2). Second, the judicial officer must determine whether any condition or combination of conditions will adequately ensure the appearance of the  Defendant  and the safety of the community against any danger posed by the Defendant's pretrial release.  See  United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988).

In meeting its burden on the issue of whether any condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community, the Government is aided by the statutory presumptions created by 18 U.S.C. 3142(e).  Where the offense charged is one of the offenses enumerated in Section 3142(f)(1), Section 3142(e) creates the rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of the community if the judicial officer finds that: (1) the Defendant has been convicted of a federal offense that is described in Section 3142(f)

15

or an offense under state law that would have been an offense described in Section 3142(f)(1) if federal jurisdiction had existed, (2) such offense was committed while the person was on release pending trial for a federal, state or local offense, and (3) a period of not more than five years has elapsed since the date of conviction or release from imprisonment for such offense. Section 3142(e) also creates the rebuttable presumption that no condition or combination of conditions will ensure the safety of the community and the appearance of the Defendant if the judicial officer finds that there is probable cause to believe that the Defendant committed an offense: (1) for which a maximum term of imprisonment of ten years or more is prescribed (a) in the Controlled Substances Act, (b) the Controlled Substances Import and Export Act, or (c) the Maritime Drug Enforcement Act; or (2) under 18 U.S.C. § 924(c). In order to rebut either presumption, the Defendant must produce "some evidence" to the contrary. <u>United States v. Jessup</u>, 752 F.2d 378, 384 (1st Cir. 1985).

In making the determination as to whether "any condition or combination of conditions will reasonably assure the appearance of the [Defendant] as required and the safety of any other person and of the community", the judicial officer is compelled to consider the following factors:

(1)   the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2)   the weight of the evidence against the person;

(3)    the history and characteristics of the person, including:

a.    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

b.    whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and

(4)    the nature and seriousness of the danger to any other person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g).

V.    <u>Discussion of Whether Detention is Warranted</u>

A.  <u>History and Characteristics</u>

1.  <u>Mr. Espinola</u>

Mr. Espinola was born on January 5, 1977, in Portugal. Mr. Espinola entered the United States when he was 2 and became a naturalized citizen when he was approximately 7. Mr. Espinola possesses both a United States and Portugese passport.

Mr. Espinola resides with his girlfriend on the third floor of a residence owned by his parents in Peabody, Massachusetts. Mr. Espinola's parents reside on the second floor. Mr. Espinola and his parents have resided at this location for 12 years and his girlfriend has lived with him for a few months. Mr. Espinola has no siblings. Mr. Espinola has aunts, uncles and cousins living in

17

Massachusetts and California.  Mr. Espinola also has a grandfather and aunts, uncles and cousins living in Portugal.

Mr. Espinola has visited Portugal four times since he arrived in the United States.  In 2001, Mr. Espinola was in Portugal for 1-2 weeks; in 2000, he visited Portugal for an unspecified period of time; and in 1997, he was in Portugal for a couple of months.  Mr. Espinola has also traveled to Mexico and Canada on one occasion each for brief visits during the past two years.

Prior to his arrest, Mr. Espinola had been employed as a mechanic for about a month.  Prior to that, he was on disability for about a year as the result of an accident (although he did work as an electrician during this period).  Prior to being "disabled", Mr. Espinola worked for an electrician for three years.

Mr. Espinola has no prior criminal record.

## 2. Mr. Baldassano

Mr. Baldassano was born on June 17, 1981, in Gloucester, Massachusetts and, except when living in Lowell while attending college, has been a life-long resident of Gloucester.  Mr. Baldassano graduated from Gloucester High School and needs to complete one class to obtain a degree in marketing and business management from the University of Massachusetts at Lowell.

Mr. Baldassano's father, mother and two sisters live in Gloucester at the family home, where Mr. Baldassano also resides.

Mr. Baldassano is currently unemployed and over the summer was planning to complete the one course needed to obtain his college

18

degree.    While attending college over the past few years, Mr. Baldassano has held a number of summer jobs.

Although Mr. Baldassano's prior criminal record is not substantial, it includes a prior conviction in the Gloucester District Court for possession of a Class B substance (OxyContin). Mr. Baldassano was on probation with respect to this offense during the period of the drug conspiracy alleged in this Complaint.

### 3. Mr. Cream

Mr. Cream was born on January 11, 1981 in Everett, Massachusetts. Mr. Cream is a high school graduate who has completed one semester of college.

Concerning Mr. Cream's residence: for the four months preceding his arrest, Mr. Cream lived in Lowell with Mr. Baldassano; for the three years prior to that, had resided with his sister in Gloucester; and for eighteen months prior to that, had resided at another address in Gloucester; and prior to that, lived at various locations within Massachusetts.

Mr. Cream's father is deceased and his mother, with whom he maintains no contact, lives in Belmont, Massachusetts. In addition to his sister who lives in Gloucester, Mr. Cream has two half-siblings, a brother who is incarcerated and a sister who resides with Mr. Cream's mother. Mr. Cream maintains a close relationship with all of his siblings.

Mr. Cream is currently unemployed and previously had worked for 2-3 months with his brother-in-law in his roofing business. Prior to that, except for a one month period or so, Mr. Cream had worked for his brother-in-law's business for two years.

### B. Nature of the Offense and Weight of the Evidence

### 1. Mr. Espinola

I have previously found probable cause for the offense charged against Mr. Espinola in this Complaint. While there is no direct evidence against Mr. Espinola, a number of individuals have

identified him as a significant source of OxyContin in the Gloucester area and the Government presented circumstantial evidence which supported those claims. Therefore, I find that the weight against Mr. Espinola is substantial.

### 2. Mr. Baldassano

The Government has presented overwhelming evidence that Mr. Baldassano is a significant dealer of OxyContin in the Gloucester area. Mr. Baldassano has been surveilled, monitored and recorded making multiple sales of OxyContin to UCs.

### 3. Mr. Cream

The Government has presented substantial evidence that Mr. Cream was involved in this conspiracy as a runner for Mr. Baldassano delivering OxyContin. Mr. Cream's activities were surveilled, monitored and recorded. The Government has presented some evidence that Mr. Cream was also a dealer of OxyContin, but such evidence is less than substantial.

### C. Rebuttable Presumption

The United States has moved for detention pursuant to 18 U.S.C. §§ 3142(f)(1)(C) and (f)(2)(A). The Government must prove that there is no condition or combination of conditions that would reasonably assure the safety of any other person or the community if Messrs. Espinola, Baldassano and Cream were released, or the appearance of Messrs. Espinola, Baldassano and Cream as required.

The rebuttable presumption created by 18 U.S.C. § 3142(e) applies in this case because Messrs. Espinola, Baldassano and Cream

are charged with a drug offense for which a maximum penalty of ten years or more is prescribed in the Controlled Substances Act. I have found probable cause exists for the offense charged against Messrs. Espinola, Baldassano and Cream in the Complaint. Therefore, I find that under 18 U.S.C. §3142(e), there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of Messrs. Espinola, Baldassano or Cream or the safety of the community if they were released. I further find that none of Messrs. Espinola, Baldassano nor Cream has produced or proffered any credible evidence on his own behalf to rebut this presumption. Without such evidence, the presumption alone may justify detention. United States v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985); United States v. Vires, 637 F. Supp. 1343, 1351 (W.D.Ky. 1986). Although I have determined that Messrs. Espinola, Baldassano and Cream have failed to rebut the presumption, for the sake of completeness, I will examine the Government's assertion that Messrs. Espinola, Baldassano and Cream pose a danger to the community and a risk of flight.

D. <u>Whether Messrs. Espinola, Baldassano and Cream Pose A Danger to the Community</u>

### 1. <u>Mr. Espinola</u>

The Government has presented substantial evidence that Mr. Espinola is a source for large amounts of OxyContin tablets. Furthermore, there is evidence that Mr. Espinola has illegally possessed at least one firearm, that Mr. Espinola has indicated a willingness to use firearms and he was found in possession of a bullet proof vest. These facts suggest that Mr. Espinola presents a potential for violence. At the same time, Mr. Espinola has no prior criminal record. Therefore, I am relying on the rebuttable presumption to detain Mr. Espinola on dangerousness grounds.

### 2. <u>Mr. Baldassano</u>

Mr. Baldassano's prior criminal record includes only one adult conviction. However, that conviction was for possession of OxyContin and he was on probation for that offense when he was monitored, recorded and surveilled selling significant amounts of OxyContin to UCs. Furthermore, both Mr. Baldassano and other members of this conspiracy indicated that because he was on probation, he was taking steps to minimize his involvement in the actual sale of the OxyContin to the UCs in an attempt to avoid being caught. Under these circumstances, I find by clear and convincing evidence that there are no conditions or combination of conditions that would assure the safety of the community if Mr. Baldassano were released.

### 3. Mr. Cream

While the Government has presented substantial evidence that Mr. Cream is a member of this conspiracy, it appears that he is a fairly low level player. While he does have a criminal record, he has no prior drug convictions and no significant convictions involving crimes of violence. Mr. Cream's sister has indicated that she is willing to let him return to her house to live with her family, and despite past problems (which have been attributed to Mr. Cream's drug addiction), his brother-in-law is willing to re-hire him in his roofing business. Under these circumstances, I find that there are conditions of release which I can impose that will guarantee the safety of the community if Mr. Cream is released.

### F. Whether Messrs. Espinola, Baldassano and Cream Pose A Risk Of Flight

### 1. Mr. Espinola

Mr. Espinola is a naturalized United States citizen who also has a Portugese passport (which is in the possession of his family and would be surrendered if Mr. Espinola were released). Although all of Mr. Espinola's immediate family resides in the United States, he does have extended family in Portugal. Mr. Espinola has visited Portugal three time in the past seven years and has stayed for extended visits from two weeks to a couple of months. Mr. Espinola has never served time and as an alleged primary source of OxyContin in this drug conspiracy, faces a significant prison

24

sentence if convicted.  Under these circumstances, I find by a preponderance of the evidence that Mr. Espinola poses a risk of flight and that there are no conditions or combination of conditions that I may impose that would assure his appearance in Court as directed.

## 2. Mr. Baldassano

Mr. Baldassano is a lifelong resident of Gloucester and all of his immediate family live in Gloucester.  Mr. Baldassano has a prior drug conviction and given his role in this drug conspiracy, faces a substantial period of incarceration if convicted.  It does not appear that Mr. Baldassano has traveled outside the United States.  Under the totality of these circumstances, I cannot find by a preponderance of the evidence that Mr. Baldassano poses a risk of flight and I decline to hold him on this ground.

## 3. Mr. Cream

It does not appear that Mr. Cream would be found to be a leader or to otherwise have a significant role in this conspiracy. Mr. Cream's entire family lives in Massachusetts and although he had a passport at one time, has not possessed it in over ten years. As stated previously, Mr. Cream has a home and work available to him.  Under these circumstances, I find that there are conditions of release which I can impose which would assure his appearance as required.  A further hearing will be held with respect to Mr. Cream on Friday, July 23, 2004 at 11:00 a.m.  Mr. Cream's sister and brother-in-law should be present at this hearing.

VI.   <u>Order of Detention Pending Trial</u>

In accordance with the foregoing memorandum,

IT IS ORDERED:

1.   That Messrs. Espinola and Baldassano be committed to the custody of the Attorney General or his designated representative, for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2.   That Messrs. Espinola and Baldassano be afforded a reasonable opportunity for private consultation with counsel; and

3.   On order of a court of the United States or on request by an attorney for the Government, the person in charge of the corrections facility in which Messrs. Espinola and Baldassano are detained and confined shall deliver them to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

<u>RIGHT OF APPEAL</u>

THE PERSON OR PERSONS DETAINED BY THIS ORDER MAY FILE A MOTION FOR REVOCATION OR AMENDMENT OF THE ORDER PURSUANT TO 18 U.S.C. § 3145(b).

/s/Charles B. Swartwood, III
CHARLES B. SWARTWOOD, III
MAGISTRATE JUDGE